# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**PATRICK A. ELWARD**
**KARL L. MULVANEY**
**BRIANA L. CLARK**
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

**ANNE L. COWGUR**
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE WABASH COLLEGE:

**THOMAS R. SCHULTZ**
Schultz & Pogue, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES PHI KAPPA PSI FRATERNITY, INC. AND PHI KAPPA PSI FRATERNITY – INDIANA GAMMA CHAPTER:

**DOUGLAS B. KING**
**MATTHEW M. ADOLAY**
**MAUREEN E. WARD**
Wooden & McLaughlin LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

FILED
Oct 02 2012, 9:24 am

CLERK
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| BRIAN YOST, | ) |
| | ) |
| Appellant-Plaintiff, | ) |
| | ) |
| vs. | )  No. 54A01-1201-CT-31 |
| | ) |
| WABASH COLLEGE, PHI KAPPA PSI | ) |
| FRATERNITY, INC., PHI KAPPA PSI | ) |
| FRATERNITY – INDIANA GAMMA | ) |
| CHAPTER AT WABASH COLLEGE, and | ) |
| NATHAN CRAVENS, | ) |
| | ) |
| Appellees-Defendants. | ) |

**October 2, 2012**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

Who is responsible when fraternity boys engage in impromptu activities that escalate to the point where one of them is seriously injured?  In this case, eighteen-year-old Wabash College freshman Brian Yost and his fraternity pledge brothers decided to throw an upperclassman brother in a nearby creek to celebrate his twenty-first birthday.  Afterwards, they tried to do the same thing to two other upperclassman brothers, but they were unsuccessful.  Shortly thereafter, four upperclassman brothers decided to carry Yost to the shower and run water on him.  On the way to the bathroom, upperclassman Nathan Cravens joined the group and placed Yost in a chokehold.  Yost went limp, and the brothers dropped him on the floor.  He suffered physical and mental injuries and had to withdraw from school.

Yost filed a personal injury action against Phi Kappa Psi National Fraternity ("Phi Psi National") and Phi Kappa Psi - Indiana Gamma Chapter ("Phi Psi") (collectively, "Phi Psi Defendants"), Wabash College ("Wabash"), and Cravens, seeking compensatory and punitive damages.  Wabash and the Phi Psi Defendants filed motions for summary judgment, claiming that they owed no duty to Yost as a matter of law, and the trial court granted both motions.

2

Yost now appeals, claiming that the trial court erred in granting summary judgment in favor of Wabash and the Phi Psi Defendants (collectively, "Appellees").[1] Specifically, he contends that the trial court erred in concluding as a matter of law that (1) Appellees were not negligent because they owed him no duty to protect him from the activities that led to his injuries; (2) Appellees did not assume a duty to Yost; (3) Appellees are not vicariously liable; and (4) Appellees are not liable for punitive damages. Finding that the designated evidence supports summary judgment in favor of the Appellees, we affirm.

## Facts and Procedural History[2]

The relevant facts are largely undisputed. At approximately 1:00 a.m. on September 4, 2007, Wabash freshman Yost and some other pledges of the Phi Psi fraternity decided to "creek" Steve Abbott, an upperclassman brother who was turning twenty-one. "Creeking" involves taking a brother to be submerged in nearby Sugar Creek and is generally done to celebrate either his engagement or his twenty-first birthday. After they successfully completed the "creeking," they unsuccessfully attempted to "creek" another brother who was leaving to study abroad. Shortly thereafter, Yost suggested that the group "creek" another brother, Grant Schmutte, who was a close friend of Yost and was already twenty-one. When the group converged on Schmutte in his room at about 2:00 a.m., Schmutte resisted, and

---

[1] Summary judgment was not entered in favor of Cravens, and he is not participating in this appeal.

[2] We heard oral argument on August 7, 2012. We thank the parties for their preparation and presentations.

3

several guys began to wrestle. Eventually, the other pledges left, and Schmutte and Yost continued to wrestle.

Schmutte then decided to "shower" Yost, and a few upperclassmen brothers assisted.[3] "Showering" involves placing a brother under running water in the shower and is often done to celebrate birthdays or other occasions. Yost flailed and resisted, not wanting to "back down from a fight." Appellant's App. at 370. As four Phi Psi brothers carried Yost to the shower, Cravens approached. Cravens, a former wrestler, placed Yost in a chokehold, and Yost went limp. When the brothers saw that Yost had lost consciousness, they panicked and dropped him. Yost suffered physical injuries as well as mental injuries that affected his memory and concentration. Neither Yost nor Phi Psi reported the incident to Wabash officials at that time, and Yost eventually withdrew from school. He re-enrolled at Wabash and re-pledged Phi Psi in the fall of 2008. Again, he did not complete the semester. Fifteen months after the incident, Cravens's parents sent Wabash officials a letter describing negative changes in their son's personality that they attributed to his participation in the Greek system at Wabash.[4]

On August 25, 2009, Yost filed a personal injury action against Cravens, the Phi Psi Defendants, and Wabash. The trial court entered a default judgment against Wabash for

---

[3] To the extent Yost argues that showering was a tradition/ritual used as punishment for a failed creeking, we note that the trial court granted the Phi Psi Defendants' motion to strike as hearsay the portions of Yost's designated evidence describing showering as a punishment ritual. Because Yost does not appeal the trial court's decision to strike this evidence, we may not consider it.

[4] Notably, portions of the parents' letter that referenced Cravens's negative experiences as a Phi Psi pledge were also stricken on hearsay grounds.

failure to respond to Yost's discovery requests. Wabash nevertheless filed a motion for summary judgment, which the trial court denied. Thereafter, Wabash filed a motion for relief from default judgment, and the trial court granted the motion.

Wabash and the Phi Psi Defendants filed motions for summary judgment, and the Phi Psi Defendants filed a motion to strike certain documents from Yost's designated evidence. The trial court held a hearing on all motions. On December 14, 2011, the trial court granted in part the Phi Psi Defendants' motion to strike certain portions of Yost's designated evidence and granted summary judgment in favor of Wabash and the Phi Psi Defendants. In its summary judgment order, the trial court concluded as a matter of law that Yost was not the victim of hazing:

> [Yost] admits that he instigated the series of events that led to the accident. There is no evidence from which it may be inferred that his actions in initiating the attempted creeking of his pledge father, and the wrestling that ensued, were coerced or otherwise forced by others. There is no evidence that any of the fraternity members' actions—whether categorized as hazing, horseplay or a "hall brawl"—created a substantial risk of bodily injury. Accepting [Yost's] version of the incident, he was not injured until (a) Cravens caused him to lose consciousness and (b) the other (nonparty) fraternity brothers released their grip on his arms and legs and he fell to the floor. The acts of the fraternity brothers—including [Yost]—may have been negligent, but [Yost] has not shown that they were criminal.

Appellant's App. at 23-24.

Because the claims against Cravens were unresolved, Wabash and the Phi Psi Defendants filed a motion for entry of final judgment pursuant to Indiana Trial Rule 54(B). The trial court granted the motion and entered final judgment for Wabash and the Phi Psi Defendants on December 29, 2011. Yost now appeals the trial court's judgment.

5

**Discussion and Decision**

*Standard of Review*

Yost contends that the trial court erred in granting summary judgment in favor of Wabash and the Phi Psi Defendants. We review the trial court's decision to grant or deny summary judgment using the same standard as the trial court. *Worman Enters., Inc. v. Boone Cnty. Solid Waste Mgmt. Dist.*, 805 N.E.2d 369, 373 (Ind. 2004). A motion for summary judgment is properly granted only when the pleadings and designated evidence reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Bank of New York v. Nally*, 820 N.E.2d 644, 648 (Ind. 2005). In determining whether issues of material fact exist, we must accept as true those facts established by evidence favoring the nonmoving party and resolve all doubts against the moving party. *Id*. A trial court's decision to grant summary judgment is clothed with a presumption of validity, and the appellant bears the burden of proving that the trial court erred. *Alexander v. Marion Cnty. Sheriff*, 891 N.E.2d 87, 92 (Ind. Ct. App. 2008), *trans. denied* (2009).

Here, as part of its summary judgment order, the trial court issued an eighteen-page statement containing the undisputed material facts and its conclusions concerning Yost's various theories of recovery against each defendant. We note that the trial court is not required to provide written findings and conclusions on summary judgment and that the conclusions are not binding on appeal, but they offer valuable insight into the trial court's rationale and thus help facilitate our review. *First Farmers Bank & Trust Co. v. Whorley*,

6

891 N.E.2d 604, 608 (Ind. Ct. App. 2008), *trans. denied.* We may affirm based on any theory supported by the designated evidence. *Cincinnati Ins. Co. v. Davis*, 860 N.E.2d 915, 922 (Ind. Ct. App. 2007).

### *Negligence and Duty*

Yost contends that the trial court erred in finding as a matter of law that Appellees were not negligent. To prevail upon a negligence claim, the plaintiff must prove by a preponderance of evidence that (1) the defendant owed a duty of reasonable care to the plaintiff; (2) the defendant breached that duty; and (3) the plaintiff suffered an injury proximately caused by the breach. *Humphery v. Duke Energy Indiana, Inc.*, 916 N.E.2d 287, 290 (Ind. Ct. App. 2009). Summary judgment is rarely appropriate in negligence cases. *Id*. However, the existence of a duty is a question of law, and absent a duty, there can be no breach and therefore no negligence. *Kroger Co. v. Plonski*, 930 N.E.2d 1, 6-7 (Ind. 2010). Summary judgment is appropriate when the undisputed material evidence negates one element of a negligence claim. *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind. 2004).

Yost argues that Appellees had a duty to protect him from his brothers' actions that led to his injuries. In *Webb v. Jarvis*, our supreme court stated that the duty of reasonable care is not owed to the world at large, but rather, to those who might reasonably be foreseen as being subject to injury by the breach of the duty. 575 N.E.2d 992, 997 (Ind. 1991). In that case, the court held that three factors must be balanced to determine whether a duty is owed: (1) the relationship between the parties; (2) the reasonable foreseeability of harm; and (3) public policy concerns. *Id*. at 995. However, the balancing test is unnecessary in cases

where duty is already clearly defined and articulated, as is the case with premises and vicarious liability. *NIPSCO v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003).

Yost asserts that Appellees breached a duty to protect him from the conduct of third persons. Absent a special relationship between the parties, there is generally no duty to control the conduct of a third party. *Swanson v. Wabash College*, 504 N.E.2d 327, 330 (Ind. Ct. App. 1987). Special relationships include parent/child, master/servant, landowner/invitee, persons in charge of one with dangerous propensities, and persons with custody of another. RESTATEMENT (SECOND) OF TORTS §§ 316-20 (2d ed. 1965). In this appeal, Yost asserts that the following special relationships exist: landowner/invitee (premises liability) and master/servant (vicarious liability). Some confusion exists as to whether Yost also relies on the doctrine of in loco parentis as the basis for creating a duty. Appellees correctly assert that Indiana has rejected the in loco parentis doctrine for college-aged students. *See Campbell v. Bd. of Trs. of Wabash Coll.*, 495 N.E.2d 227, 232 (Ind. Ct. App. 1986) (emphasizing that because college students and fraternity members are adult citizens, colleges and fraternities are not expected to assume in loco parentis role), *trans. denied* (1987). In his reply brief, Yost states that he does not rely on the in loco parentis doctrine, yet he also states that "Indiana's rejection of a general *in loco parentis* duty for college-age students does not relieve [the Appellees] of duties they assumed." Reply Br. at 7. We address assumption of duty below and need not conduct an independent discussion of the in loco parentis doctrine.

8

Here, the trial court found as a matter of law that neither Wabash nor the Phi Psi Defendants owed Yost a duty to protect him under these circumstances. The court also found as a matter of law that none of the Appellees assumed a duty to protect Yost from the conduct that resulted in his injuries. While we agree with the trial court's decision to grant summary judgment in favor of the Appellees, we affirm based on our conclusion that as a matter of law the Appellees did not breach their standard of care under the evidence designated in this case. We will address each of Yost's theories of recovery below.

### *Theories of Recovery*

### *I. Premises Liability*

Yost relies on premises liability as a basis for arguing that Wabash, as owner and landlord of the Phi Psi house property, had a duty to protect him from the activities that led to his injury. Landowners have a duty to take reasonable precautions to protect their invitees[5] from foreseeable criminal attacks, i.e., hazing. *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1052 (Ind. 2003). The duty extends only to harm from the conduct of third persons that is reasonably foreseeable to the landowner given the designated facts. *Id.*

Throughout the proceedings below and in his appellate filings, Yost has characterized the September 4, 2007 incident as "hazing." *See*, *e.g.*, Appellant's Br. at 15. He argues that this "hazing" incident constituted criminal conduct foreseeable to landowner/landlord Wabash based on the history of hazing on its campus and that Wabash therefore had a legal

---

[5] An invitee is a "person who has an express or implied invitation to enter or use another's premises such as a business visitor or a member of the public to whom the premises are held open." BLACK'S LAW DICTIONARY 846 (8th ed. 2004).

duty to protect him from it. A finding of hazing is not dispositive of liability in this case, but because Yost consistently characterizes the conduct as such, we begin by examining Indiana's anti-hazing statute as well as cases involving allegations of hazing.

Indiana's anti-hazing statute criminalizes conduct that constitutes hazing. *See,* Ind. Code § 35-42-2-2(b) (stating that a person who recklessly, knowingly, or intentionally performs hazing is subject to prosecution for criminal recklessness). At the outset, we note that neither the Phi Psi Defendants nor Wabash was charged with hazing as a criminal act; however, we find the statutory definition of hazing to be instructive in this civil action for damages. We also note that the trial court and the parties treated this definition as dispositive in this civil hazing action. Indiana Code Section 35-42-2-2(a) defines "hazing" as "forcing or requiring another person … with or without the consent of the other person … and … as a condition of association with a group or organization … to perform an act that creates a substantial risk of bodily injury."

Yost argues that hazing was foreseeable criminal conduct at Wabash. As such, he submitted as designated evidence a list of hazing incidents at the various Wabash fraternity houses. In each instance, the college took action in the form of meetings with chapter officers and members or disciplinary action against the offending chapter. Among these were alcohol consumption incidents, physical labor incidents, incidents involving forced boxing matches and paddle fights between pledges, incidents involving verbal hazing, an incident involving masturbation, and an incident in which a pledge was tied to a pole. Appellant's App. at 457-64. None of the aforementioned involved the Phi Psi house, and the

10

only designated incidents involving the Phi Psis were two occurrences in which active members threw trash or debris on sleeping pledges.[6] Notably, these two occurrences did not involve a substantial risk of bodily injury as required by the statute. With respect to hazing incidents at other fraternities, we reject the notion that Wabash's knowledge of those incidents translates to turning a blind eye to the incidents giving rise to this case. Also, to the extent that the list contains incidents that occurred after September 4, 2007, such incidents are irrelevant to our discussion of foreseeable criminal conduct.

In this vein, the dissent asserts that Wabash has turned a blind eye toward hazing and lists among the hazing incidents at Wabash two incidents that resulted in the death of students. While the dissent notes that both incidents happened after Yost's showering, we fail to see how such subsequent developments are relevant to our concerns in this case. In other words, on September 4, 2007, Wabash could not have turned a blind eye to incidents that occurred in October 2007 and October 2008. Moreover, to the extent the dissent cites the deaths as support for an argument that Wabash failed to take a hard line in disciplining fraternities for hazing, we note that the fraternity involved in the 2008 incident was removed from campus.[7]

Although Indiana courts have addressed liability for universities and fraternities stemming from injuries incurred by plaintiffs on university or fraternity property, none have

---

[6] In both instances involving Phi Psi, the dean and associate dean worked with the chapter leadership to prevent similar occurrences.

[7] With respect to the October 2007 incident, the student fell from the roof of an academic building, and his fall was found to have no connection to the fraternity at which the decedent had been a pledge.

11

specifically addressed liability for these defendants based on allegations of injuries stemming from an incident involving fraternity hazing.[8] Courts in other jurisdictions have directly addressed allegations of hazing within college fraternities. Generally, the defendants have included, as here, the college, the national fraternity, the local fraternity chapter, and any individual perpetrator(s). The cases have usually focused on activities surrounding initiation rituals. More often than not, the hazing has involved excessive fraternity-sponsored alcohol consumption, but in some cases, bizarre physical rituals were involved.[9]

In one of the most notorious cases, *Furek v. University of Delaware*, 594 A.2d 506 (Del. 1991), a fraternity "Hell Night" ritual involved spraying initiates with a fire extinguisher, paddling them, forcing them to eat food out of toilets, blindfolding them, and dousing them with ketchup and other food. During the Hell Night activities, one of the fraternity members poured a lye-based liquid oven cleaner over initiate Furek's back and neck. Furek was hospitalized with first- and second-degree burns, was permanently scarred, and withdrew from the university, forfeiting his football scholarship. *Id*. at 509-10. He filed a personal injury action against the university, the local fraternity, the national fraternity, and

---

[8] *See e.g.*, *Delta Tau Delta v. Johnson*, 712 N.E.2d 968 (Ind. 1999) (sexual assault of female party guest at fraternity house by alumni member not living at house); *L.W. v. W. Golf Ass'n*, 712 N.E.2d 983 (Ind. 1999) (intoxicated female member of co-ed scholarship house sexually assaulted by male co-resident); *Hayden v. Univ. of Notre Dame*, 716 N.E.2d 603 (Ind. Ct. App. 1999) (spectator injured by another spectator at college football game), *trans. denied* (2000); *Campbell*, 495 N.E.2d at 227 (female guest of individual fraternity member injured in auto accident after consuming alcohol in member's room); *Foster v. Purdue Univ. Chapter, The Beta Mu of Beta Theta Pi*, 567 N.E.2d 865 (Ind. Ct. App. 1991) (intoxicated freshman fraternity member rendered quadriplegic by diving onto makeshift waterslide at fraternity event), *trans. denied*.

[9] For an overview of the potential liability of various defendants for hazing incidents, *see*, Cheryl M. Bailey, Annotation, *Tort Liability of College, University, Fraternity, or Sorority for Injury or Death of Member by Hazing or Initiation Activity*, 68 A.L.R. 4th 228 (1989).

the individual perpetrator. In reversing the trial court's decision to grant the university's motion for JNOV, the *Furek* court considered the university's duty as landowner and examined the issues of foreseeability and premises control. The court also emphasized that although a university no longer stands in loco parentis to its students, the relationship between university and student is sufficiently close such that a duty may be imposed based on assumption of duty or on foreseeable dangerous activities occurring on its property. *Id*. at 522. It is difficult to discern whether the *Furek* court relied on the unique cumulative circumstances of the case, i.e., the standard of review, the university's affirmative attempts to control fraternity hazing, and the university's position as landowner, in reaching its decision or whether the court intended to create a limited special duty between university and student.[10]

In *Morrison v. Kappa Alpha Psi Fraternity*, 738 So. 2d 1105 (La. Ct. App. 1999), *writ denied*, a fraternity president physically beat a freshman student during a fraternity membership interest meeting held in the president's dorm room. The freshman filed a personal injury action against the university, the university's insurer, the national fraternity, and the fraternity president. The Louisiana Court of Appeals affirmed a jury verdict against the university, emphasizing that because the university had knowledge and documentation of

---

[10] The Kansas Supreme Court interpreted it as the latter in *Nero v. Kansas State University*, 861 P.2d 768 (Kan. 1993), and specifically declined to follow *Furek*, at least to the extent that the *Furek* court appeared to "impose at least a limited duty upon the university to protect students from their fellow students' actions." *Id*. at 777. We agree with the *Nero* court in this respect.

prior hazing incidents involving the particular fraternity, it had a duty to monitor and prevent further prohibited hazing activity by that fraternity. *Id*. at 1115.

In cases involving allegations of hazing by alcohol, the decisions have generally hinged upon whether the alcohol consumption was part of a college- or fraternity-sponsored activity or ritual. *See*, *e.g.*, *Ballou v. Sigma Nu Gen'l Fraternity*, 352 S.E.2d 488 (S.C. Ct. App. 1986) (holding that where pledges were forced to drink alcohol as part of local chapter's initiation "hell night" activities and national fraternity benefited from initiation of new members, national fraternity was liable under apparent authority for pledge's death due to excessive alcohol consumption); *see also Oja v. Grand Chapter of Theta Chi Fraternity Inc.*, 680 N.Y.S.2d 277 (N.Y. App. Div. 1998) (affirming denial of landowner/house corporation's motion to dismiss action stemming from death of pledge from forced excessive alcohol consumption as part of hazing ritual where house corporation knew of recurring dangerous activities, had sufficient right to control such activities, and failed to do so); *see also Garofalo v. Lambda Chi Alpha Fraternity*, 616 N.W.2d 647 (Iowa 2000) (affirming summary judgment in favor of local and national fraternity in wrongful death action where underage pledge died of alcohol poisoning following big brother/little brother ceremony, drinking was not part of the ritual or ceremony, alcohol was purchased by big brothers and not by fraternity, and at least one pledge chose not to drink.)

Here, the parties disagree about whether the activities resulting in Yost's injuries were "hazing," the intervening criminal act of one brother, or merely horseplay that got out of hand. Yost contends that despite Wabash's characterization of the incident as horseplay,

14

"there is no doubt that the events *leading up to* Yost's injury constituted hazing." Appellant's Br. at 15 (emphasis added). It appears from the remainder of Yost's argument that he contends that the hazing began when the four brothers first picked him up and carried him toward the bathroom to be showered. He cites his resistance by "kicking and screaming" as evidence that he was being hazed. *Id*. at 16 (citing Appellant's App. at 489). Appellees cite Yost's other statements that he initially viewed the showering as a fun event in which he could demonstrate his ferocity by resisting the brothers' efforts. *Id.* We note, however, that the hazing statute explicitly states that consent is irrelevant in determining whether hazing occurred.

Consent notwithstanding, the trial court and the parties treated the statutory definition as dispositive, and the trial court applied the definition, finding as a matter of law that Yost had not been the victim of hazing. The court specifically noted that Yost had instigated the series of events, that the events were not coerced or forced by the other brothers, and that until Cravens placed him the chokehold, there was no evidence that the activities created a substantial risk of bodily injury. We disagree with the trial court's finding that there was no substantial risk of bodily injury until Cravens intervened, as common sense tells us that there is a substantial *risk* of bodily injury whenever a person is thrown into a potentially slick shower or a rocky creek. Nevertheless, we may affirm on any basis argued by the parties and supported by the designated evidence. *Breining v. Harkness*, 872 N.E.2d 155, 158 (Ind. Ct. App. 2007), *trans. denied* (2008).

15

Other designated evidence shows that the traditions of creeking and showering were ordinarily planned, celebratory events involving all or most of the fraternity brothers. Here, the activities were impromptu and not in keeping with the parameters specified in the pledge manual. This is not to say that, in order to constitute hazing, the objectionable activity must be attended by all members of a given fraternity. *See e.g.*, *Morrison*, 738 So. 2d at 1110 n.1 (finding liability for hazing where fraternity president physically beat freshman potential pledge in president's dorm room during fraternity membership interest meeting even though only one other active fraternity member and two other potential pledges were present). Nonetheless, here, pledge training had not officially begun on the night when Yost and his pledge brothers decided to creek Abbott and Schmutte. Yost was the person who made the decision to creek Schmutte, who was neither engaged nor having a birthday, and he chose Schmutte based on their friendship. Also, by the time the upperclassmen brothers decided to shower Yost, Yost's pledge brothers had scattered and gone to bed. Moreover, Yost's desire to impress the brothers by fighting ferociously did not amount to a condition of his membership. On the contrary, the designated evidence contains Schmutte's affidavit, in which he characterized Yost as one of his "very best friends" and specifically stated,

> My efforts to place [Yost] in the shower had nothing to do with his status as a pledge or my status as an active brother in the fraternity …. [and] [t]he attempt … was in no way a condition of his association with the fraternity [and that,] [r]egardless of whether he did or didn't resist, his standing in the fraternity would not have been affected in any way.

Appellant's App. at 836-38.

16

In short, neither the brothers' attempt to shower Yost nor Cravens's chokehold were activities forced upon Yost as a condition of membership; rather, they simply amounted to an escalation of the preceding impromptu activities, i.e., the attempted creeking and the wrestling. Even though showering was a recognized chapter tradition, in these particular circumstances, it was a spontaneous act of a few brothers rather than a fraternity-sponsored activity.[11] Consequently, we find that the designated evidence supports the trial court's conclusion that as a matter of law Yost's showering did not amount to hazing.

Notwithstanding, the special relationship between landowner/landlord and invitee/tenant creates in the former a duty to protect the latter from foreseeable criminal activity, whether hazing or otherwise. In 1999, our supreme court simultaneously decided a trio of cases concerning a landowner/landlord's duty to take reasonable care to protect its invitees/tenants from criminal attack. *Delta Tau Delta, Beta Alpha Chapter v. Johnson*, 712 N.E.2d 968 (Ind. 1999); *Vernon v. Kroger Co.*, 712 N.E.2d 976 (Ind. 1999); and L.W. v. *Western Golf Ass'n*, 712 N.E.2d 983 (Ind. 1999).

In the lead opinion, *Delta Tau Delta*, 712 N.E.2d at 973, the court applied a totality of circumstances test and reasoned that although landowners are not insurers of an invitee's safety, they are required to take reasonable precautions to prevent foreseeable criminal acts against the invitees. *Id.* Under the totality of the circumstances test, a court considers all of

---

[11] To the extent Yost relies on stricken evidence to support his argument that he was being showered as punishment for a failed creeking, we reiterate that we cannot consider such evidence. The designated evidence includes Schmutte's affidavit, in which he states that it "is not mandatory for pledges or active members of the fraternity to creek another Wabash Phi Psi member on [his] 21st birthday, and there is no penalty to active or pledge members of the fraternity for failing to attempt, or to complete, the creeking of a fraternity member …" Appellant's App. at 835.

17

the circumstances surrounding an event, including the nature, condition, and location of the land, as well as prior similar incidents, to determine whether a criminal act was foreseeable. *Id*. at 972.

Years later, in *Bartolini*, *supra*, our supreme court declined to follow the "totality of circumstances test" that it had laid down in *Delta Tau Delta* and its companion cases, stating that "where … the alleged duty is well-established, there is no need for a new judicial redetermination of duty." 799 N.E.2d at 1053. The *Bartolini* court also stated, "There is no doubt, however, that reasonable foreseeability is an element of a landowner or business proprietor's duty of reasonable care. The issue is merely at what point and in what manner to evaluate the evidence regarding foreseeability." *Id*. That same year, then-Justice Theodore Boehm wrote a law review article on the subject of duty and reasoned that instead of resolving cases by finding that no duty exists, "it would seem more accurate to identify the reason the plaintiff lost as a failure to establish either unreasonable conduct or causation." Hon. Theodore R. Boehm, *A Tangled Webb-Reexamining the Role of Duty in Indiana Negligence Actions*, 37 Ind. L. Rev. 1, 4 (2003). In keeping with the approach adopted by our supreme court in *Bartolini* and explained by Justice Boehm, we dispose of this claim based on our finding as a matter of law that Yost failed to establish that Wabash breached its landowner duty to act reasonably toward him under these circumstances.

Notwithstanding, we find that *Delta Tau Delta* and *Western Golf* are worthy of discussion due to their factual and contextual similarities to this case. *Delta Tau Delta* involved an intoxicated female party guest, Johnson, who was sexually assaulted at a

fraternity house by a fraternity alumnus who had attended the same fraternity-sponsored after-football-game party. Our supreme court held that the local fraternity chapter had a duty as landowner to take reasonable care to protect Johnson from a foreseeable sexual assault. *Id*. at 973. The Court found that the sexual assault against Johnson was foreseeable based on two prior incidents of assault at the Delta Tau Delta house within the two years preceding the assault as well as literature that the local chapter had recently received from its national fraternity containing statistics on sexual assault at fraternity houses and the fraternities' exposure to liability therefrom. *Id.* at 973-74. Without expressing a view on the overall merits of the negligence claim against the local chapter, our supreme court held that summary judgment was inappropriate and remanded the case for trial on this issue. Notably, the sexual assault in *Delta Tau Delta* occurred at the chapter house following a party that was sponsored by the local chapter. In contrast, where injury is sustained as a result of individual activity not sponsored by the fraternity or college, courts are more reticent to find duty based on foreseeability. *See*, *e.g.*, *Campbell*, 495 N.E.2d at 228-29 (holding that neither college nor fraternity owed a legal duty to protect social guest of individual fraternity member where guest and fraternity member privately consumed alcohol provided by member, not in conjunction with any college- or fraternity-sponsored event, and guest was injured when intoxicated member drove off the road while driving her home).

In *Western Golf,* 712 N.E.2d at 985, our supreme court affirmed the trial court's summary judgment order, holding that under the totality of the circumstances, the landowner association and foundation did not owe a duty to protect a female member of the Evans

Scholars house from being raped by a male Evans Scholars member while she was unconscious on her bed due to intoxication. The *Western Golf* court noted that while the record contained evidence of childish pranks and embarrassing conduct by a few isolated individuals, it did not contain evidence of prior violent acts or sexual assaults at the co-ed Evans Scholars house such as to make the perpetrator's actions reasonably foreseeable. *Id*.[12]

We find an interesting factual parallel between *Western Golf* and the instant case, in that each neither case involves the classic criminal conduct of a *third party*. Instead, these cases both involve co-tenants, each with a right to be on the premises, and acts committed between/among those co-tenants within the walls. The incident within Phi Psi's walls culminated in Yost being placed in a chokehold and dropped on the floor. There is no evidence indicating that Cravens or any other brother was charged with a crime, i.e., assault or battery, based on those acts. Although the lack of an actual criminal charge is not dispositive, we find no designated evidence of criminal intent on the part of Cravens, Schmutte, or the other brothers.[13] Thus, we conclude as a matter of law that landowner Wabash did not breach its duty to protect Yost from foreseeable *criminal* conduct.

---

[12] In the third case in the trio, *Vernon v. Kroger Co.*, *supra*, our supreme court found reasonable foreseeability sufficient to preclude summary judgment for Kroger in a personal injury action brought by a shopper who was beaten by a fleeing shoplifter in the store parking lot. *Id*. at 979. The *Vernon* court cited the history of shoplifting and battery offenses at the particular Kroger store. *Id*. at 980.

[13] As previously noted, Cravens was a wrestler and placed Yost in a wrestling-like hold. There is simply no evidence that he possessed criminal intent to harm Yost. The only insight into the alleged negative changes in Cravens's personality is gained through his parents' letter, which post-dated the Yost incident and which was stricken in part on motion of the Phi Psi Defendants.

Notwithstanding, we can envision a scenario in which a landowner college may be liable for inherently dangerous activities that fall short of criminal activity but create a substantial risk of bodily injury. In other words, a college might breach its duty of care to its students/invitees by creating or allowing an inherently dangerous environment to exist where no crime is committed but where it is foreseeable that students/invitees will be placed in jeopardy as a result, i.e., a college-sponsored event in which students are drinking and engaging in dangerous activities such as a slip-and-slide or a race involving bicycles or all-terrain vehicles.

Here, Wabash did not create the danger, and the record contains no evidence that the danger was foreseeable. Wabash was not even aware of Phi Psi's traditions of creeking and showering, and to the extent Yost cites Wabash's right to enter the chapter house to ensure that its anti-hazing rules are enforced, we note that a landlord's *right* to enter does not impose a correlating *duty* upon the landlord to enter in the middle of the night to ensure that the co-tenants are behaving reasonably with respect to each other. To the extent Yost bases his argument upon Wabash's knowledge of prior fraternity hazing activities on its campus, we reiterate that all but two of the designated incidents involved fraternities other than Phi Psi, and where we recognize that such incidents indicate a general foreseeability with respect to hazing, we reject the notion that foreseeability that one or more "animal houses" have a propensity to haze operates as foreseeability vis-à-vis all fraternities on a given campus. The only designated incidents involving Phi Psi were two occurrences in which the active brothers threw trash/debris on sleeping pledges, an activity which, while demeaning, does not

21

involve a substantial risk of injury as required under the statutory definition of hazing. At the time of Yost's injury, pledge training had not officially begun at Phi Psi, and the prior incidents involving their particular fraternity did not portend the activities that precipitated Yost's injury.

Simply put, Wabash was not the guarantor of Yost's safety, and, short of placing a representative of the college on every floor of the fraternity on a round-the-clock basis, it is difficult to discern what Wabash could have done differently to protect him under these facts. *See Oja*, 680 N.Y.S.2d at 278 ("[T]he owner of a fraternity house does not ordinarily have a legal duty to affirmatively supervise those present in the house to prevent them from voluntarily engaging in conduct that creates a risk of harm to themselves."). Yost has failed to establish a genuine issue of material fact regarding whether Wabash breached its landowner duty to protect him under the circumstances.

## II. *Assumption of Duty*

Yost also claims that Appellees affirmatively assumed a duty for his safety. During the summary judgment proceedings, Yost framed his assumption of duty argument in terms of Appellees affirmatively assuming a duty to protect him from *hazing*. Appellant's App. at 133-34, 400-03. He now argues that the Phi Psi Defendants affirmatively assumed a duty for his general health and safety. In support of his broader argument that the Phi Psi Defendants assumed a general duty of safety and health, he now cites two statements contained in Phi Psi National's manual: (1) that the "traditions and character of Phi Psi will take the place of parental restrictions;" and (2) that "[a]t the very least, the chapter is responsible for

22

safeguarding the health, safety and well-being of its pledges." Appellant's App. at 646, 651.

We find that Yost has waived this argument by failing to raise it during the summary

judgment proceedings. *See Showalter v. Town of Thorntown*, 902 N.E.2d 338, 342 (Ind. Ct.

App. 2009) (stating that "substantive questions independent in character and not within the

issues presented to the trial court shall not be first made upon appeal") (citation omitted),

*trans. denied*. Below, the trial court concluded as a matter of law that Yost was not hazed.

As such, the conclusion was dispositive of Yost's argument that Appellees assumed a duty to

protect him from hazing. The trial court cannot now be found to have erred regarding an

argument that it never had an opportunity to consider. *Id.*

Waiver notwithstanding, a duty of care may arise where one party gratuitously or

voluntarily assumes such a duty. *Delta Tau Delta*, 712 N.E.2d at 975. An assumption of

duty creates a special relationship between the parties and a corresponding duty to act as a

reasonably prudent person. *Id.* Although the existence and extent of an assumed duty is

generally a question of fact for the jury, it may be resolved as a matter of law if the

designated evidence is insufficient to establish such a duty. *Id.* Restatement (Second) Of

Torts Section 324A(b) (2d ed. 1965) states that one who undertakes to render services to

protect a third person is subject to liability to the third person resulting from his failure to

exercise reasonable care if he has undertaken to perform a duty owed by the other to the third

person.[14] "The actor must specifically undertake to perform the task he is charged with

---

[14] According to Restatement (Second) Of Torts Section 319 (1965), one who takes charge of a third person who he knows or should know is likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

having performed negligently, for without the actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully." *Am. Legion Pioneer Post No. 340 v. Christon*, 712 N.E.2d 532, 535 (Ind. Ct. App. 1999) (citation and quotation marks omitted), *trans. denied*. This means that the defendant must have undertaken the duty both "specifically and deliberately …. [I]t is also important that the party on whose behalf the duty is being undertaken relinquish control of the obligation; the party who adopts the duty must be acting '*in lieu of*' the original party." *Griffin v. Simpson*, 948 N.E.2d 354, 360 (Ind. Ct. App. 2011), *trans. denied*.

In *Delta Tau Delta*, our supreme court held as a matter of law that the national fraternity did not gratuitously assume a duty to protect a female sexual assault victim by sending a series of posters to the local chapter professing that Delta Tau Delta Fraternity was a leading fighter against date rape and alcohol abuse. *Id*. There, the court distinguished the ruling in *Ember v. B.F.D., Inc.*, 490 N.E.2d 764 (Ind. Ct. App. 1986), *modified*, 521 N.E.2d 981 (Ind. Ct. App. 1988), wherein another panel of this Court found that the defendant tavern had gratuitously assumed a duty to protect persons in the vicinity of the tavern by distributing flyers specifically touting its security patrol. *Delta Tau Delta*, 712 N.E.2d at 975.

In *Foster*, 567 N.E.2d at 865, another panel of this Court affirmed summary judgment in favor of the national fraternity and local fraternity association where inebriated freshman fraternity member Foster broke his neck after diving onto a waterslide at the chapter house during a party. *Id*. The court rejected Foster's argument that the local fraternity association affirmatively assumed a duty to control the chapter members' conduct based on its execution

24

of chapter by-laws, noting first that the association resolutions were recommended but not binding and that even if they were binding on fraternity members, Foster, as a member, would be contractually bound to control his own behavior. *Id*. at 871. The *Foster* court also rejected the injured member's argument that the national fraternity had affirmatively assumed a duty to control its members by distributing an advisory pamphlet on alcohol abuse, sanctioning at least one chapter for alcohol-related problems, and conducting an inspection of his chapter. *Id*. at 872.

In contrast, in *Furek*, *supra*, the Delaware Supreme Court held that the university's actions amounted to an assumption of duty as one in charge of a person having dangerous propensities:[15]

> The evidence in this record … strongly suggests that the University not only was knowledgeable of the dangers of hazing but, in repeated communications to students in general and fraternities in particular, emphasized the University policy of discipline for hazing infractions. The University's policy against hazing, like its overall commitment to provide security on its campus, thus constituted an assumed duty which became "an indispensable part of the bundle of services which colleges ... afford their students."

594 A.2d at 520 (citation and quotation marks omitted).

With respect to assumption of duty by the national fraternity, the Louisiana Court of Appeals concluded in *Morrison*, *supra*, that based upon the national fraternity's complex hierarchical system for controlling its local chapters' charters as well as its knowledge of prior hazing incidents at the particular local chapter, the national fraternity had undertaken a duty to regulate that local chapter to the extent necessary to protect Morrison from hazing.

---

[15] RESTATEMENT (SECOND) OF TORTS § 319 (2d ed. 1965).

738 So. 2d at 1118. The *Morrison* court also held that based on the amount of control it had maintained over its collegiate chapters, the national fraternity had undertaken a duty to regulate, protect against, and prevent hazing. *Cf. Walker v. Phi Beta Sigma Fraternity (RHO Chapter)*, 706 So. 2d 525 (La. Ct. App. 1997) (holding that national fraternity did not assume a duty to protect members from hazing where national fraternity had no knowledge of hazing activities at local chapter and local chapter purposely hid hazing activities from national fraternity).

In *Coghlan v. Beta Theta Pi Fraternity*, 987 P.2d 300 (Idaho 1999), the Idaho Supreme Court confronted a claim that a university and several Greek houses had assumed a duty for the safety of a freshman sorority member. There, the intoxicated freshman, Coghlan, was injured when she fell from a third-floor fire escape at her sorority after drinking alcohol at two different fraternity parties in conjunction with "Rush Week" festivities. *Id*. at 305. She filed a negligence action against the university, her sorority, and the three fraternities that sponsored the parties. The trial court dismissed the claim against the university, finding that Coghlan had failed to state a claim and that the university did not owe her a duty of care. The trial court granted summary judgment in favor of the sorority and the three fraternities. On appeal, the Idaho Supreme Court recognized the diminished custodial role of modern universities and "decline[d] to hold that Idaho universities have the kind of special relationship creating a duty to aid or protect adult students from the risks associated with the students' own voluntary intoxication." *Id*. at 400. However, the court found that by sending two of its employees to supervise one of the fraternity parties that Coghlan attended, the

26

university may have voluntarily undertaken to perform an act, creating a duty where one previously did not exist. *Id*. The court withheld opinion on the merits but reversed the dismissal order, holding that the pleadings were sufficient to state a claim against the university for assumption of duty. *Id*. Likewise, concerning Coghlan's sorority, the court held that the sorority's "limited influence over Coghlan did not constitute a special relationship sufficient to create an affirmative duty … to aid or protect Coghlan from injuries resulting from her voluntary intoxication." *Id*. at 401. However, the *Coghlan* court held that the designated evidence concerning the sorority's affirmative acts of sending Coghlan to alcohol parties and assigning her an older member to serve as her "guardian angel" were sufficient to preclude summary judgment on the issue of assumption of duty. *Id*. at 402.

### A. Wabash

Here, the trial court found as a matter of law that Wabash did not assume a duty to protect Yost from this incident. Yost asserts that Wabash affirmatively assumed a duty to supervise and regulate its fraternities by: implementing a strict anti-hazing policy that imposed on the fraternities a duty to report hazing; specifically designating an associate dean as housing officer to oversee issues involving all fraternities on campus; designating an inter-fraternity council ("IFC") to promote high standards for all fraternities on campus; imposing sanctions against fraternities for prior infractions; and reserving the right to enter the fraternity chapter houses. These activities are largely responsive in nature. In other words, the college promulgated the policy, but the roles of both the dean and the IFC are to educate and to respond to fraternity issues. They cannot possibly be in the business of preventing

27

each and every activity taking place inside the walls of every fraternity, nor did they deliberately undertake to do so. Thus, we conclude that the undisputed designated evidence simply does not support a finding that Wabash affirmatively assumed a duty to protect Yost under these facts.

### B. The Phi Psi Defendants

The trial court also found as a matter of law that the Phi Psi Defendants did not affirmatively assume a duty to protect Yost from hazing. Yost claims that Phi Psi National affirmatively assumed a duty to protect him from his injuries based on specific rules and literature that it disseminated to local fraternity chapters as well as its right to discipline offending chapters. He relies on language contained in Phi Psi National's manual as well as language contained in a risk management guide. To the extent that he relies on the contents of the risk management guide, we note that the guide was a product of Phi Psi National's insurer, which is not a party to this action. The cases on the subject of assumption of duty seem to hinge not merely upon the promulgation of rules, but upon the degree of activity by the national fraternity in policing its collegiate chapters, i.e., in the form of direct on-site interaction with chapters, control over intake and expulsion of members, etc.

Yost specifically cites Phi Psi National's promulgation of an anti-hazing policy, which states,

> No chapter, colony, student or alumnus shall conduct nor condone hazing activities. Hazing activities are defined as:
>     "Any action taken or situation created, intentionally, whether on or off fraternity premises, to produce mental or physical discomfort, embarrassment, harassment, or ridicule. Such activities may include but are not limited to the following: use of alcohol; paddling in any form; creation of excessive fatigue;

28

physical and psychological shocks; quests, treasure hunts, scavenger hunts, road trips, or any other such activities carried on outside or inside of the confines of the chapter house; wearing of public apparel which is conspicuous and not normally in good taste; engaging in public stunts and buffoonery; morally degrading or humiliating games and activities; and any other activities which are not consistent with academic achievement, fraternal law, ritual or policy or the regulations and policies of the educational institution."

Appellant's App. at 654-65. Phi Psi National's manual also includes a history section, which states in part that in recognition that activities concerning pledges were "not always wholesome, constructive, or safe … [in 1928,] Phi [] Psi became the first national social fraternity to create a department to oversee and improve this portion of fraternity life." *Id*. at 648.

Other designated evidence shows that Phi Psi National is an Indianapolis-based organization with sixteen employees and ninety-six collegiate Phi Psi chapters throughout the country. Phi Psi National's manual describes the local chapter as "a complete self-governing body." *Id*. at 854. Its constitution, bylaws, and rules give the local chapter original jurisdiction for matters concerning the conduct of a member, and Phi Psi National may not insert itself into any action unless the aggrieved member appeals the local chapter's decision or the local chapter fails to act. *Id*. at 863, 866-67. Phi Psi National also designated evidence that the creeking and showering were not part of the national fraternity's traditions or rituals and that Phi Psi National was not even aware that they were local chapter traditions. As such, the designated materials are devoid of any evidence that Phi Psi National assumed a duty to protect Yost in this instance.

29

With respect to Phi Psi's local chapter rules and policies, Yost cites his pledge packet, which requires the pledges to participate in an online program called "GreekLifeEdu." *Id*. at 517. He also emphasizes that the pledge packet includes creeking and showering as chapter traditions to be followed: "Indiana Gamma Traditions: Anyone reaching his 21st birthday or becoming engaged is thrown into Sugar Creek. Anyone having a birthday other than his 21st is to be thrown in the shower." *Id*. Yost argues that by establishing these traditions and rituals, Phi Psi assumed a duty to supervise them. Notably, however, neither Yost's attempted creeking of Schmutte (who was already twenty-one and had not become engaged) nor the upperclassmen's attempted showering of Yost (who was not having a birthday) fit within the occasions listed in the traditions section of the manual. The dissent relies on language in Phi Psi *National's* manual as support for its conclusion that Phi Psi local assumed a duty to oversee its members. *See Id*. at 648 (stating, "The activities required [for membership] were not always wholesome, constructive, or safe, so Phi Kappa Psi became the first national social fraternity to create a department to oversee and improve this portion of fraternity life. This was accomplished in 1928[.]"). However, the National Manual merely amounted to a historical report concerning steps that Phi Psi National had taken eighty-five years earlier to address hazing issues and addressed national, not local, oversight.

Also, other designated evidence indicates that creeking and showering were typically performed as planned events involving the whole house, not as spontaneous events instigated by an isolated group. Tradition notwithstanding, the local Phi Psi chapter simply cannot be expected to supervise unscheduled creekings or showerings about which they are unaware.

Thus, based on the undisputed designated evidence, we conclude as a matter of law that Phi Psi did not assume a duty to protect Yost under these circumstances.

### III. Vicarious Liability

In a closely-related argument involving the issue of control, Yost asserts that the trial court erred in concluding as a matter of law that Appellees were not liable on the basis of vicarious liability. To be liable on this theory, an agency relationship must exist. *Foster*, 567 N.E.2d at 872. "Agency is a relationship which results from manifestation of consent by one party to another. The elements of agency are consent and control. An agent must acquiesce to the arrangement, and be subject to the principal's control." *Id*. Where apparent authority is at issue, it must be initiated by a manifestation of the principal. *Swanson*, 504 N.E.2d at 331 (citations and quotation marks omitted). In other words,

> the necessary manifestation is one made by the principal to a third party who in turn is instilled with a reasonable belief that another individual is an agent of the principal. It is essential that there be some form of communication, direct or indirect, by the principal, which instills a reasonable belief in the mind of the third party. Statements or manifestations made by the agent are not sufficient to create an apparent agency relationship.

*Id*. at 331-32.

Vicarious liability may also be based on the doctrine of respondeat superior, which states that an employer is for the torts of its employee committed within the scope of employment. *Trinity Lutheran Church, Inc. v. Miller*, 451 N.E.2d 1099, 1102 (Ind. Ct. App. 1983). The test to determine the existence of an employer/employee relationship is the right to direct and control the employee's conduct at the time the tortious act occurred. *Id*. In *Trinity Lutheran*, another panel of this Court affirmed a jury verdict against a church and in

31

favor of a motorcycle rider who was struck by a vehicle driven by a church member who was delivering baskets to shut-in church members. The *Trinity Lutheran* Court found that even though the church member was acting gratuitously, he was subjecting himself to the control of the church guild as he delivered the baskets. *Id*. at 1102-03. The court emphasized the church guild's acts of inviting the church member to drive, organizing his delivery route, providing the goods for delivery, and instructing him to deliver according to the plan. *Id*. As such, the evidence was sufficient to support the jury's finding of liability under respondeat superior.

In the college/student context, vicarious liability based on respondeat superior is less likely to be established due to the difficulty in establishing that the student acted within the scope of any employment relationship with the college. *Cf. Brueckner v. Norwich University*, 730 A.2d 1086 (Vt. 1999) (military college held liable under respondeat superior where cadre of older students assigned to indoctrinate and orient incoming freshmen physically assaulted a freshman student, destroyed his academic work, vandalized his room, and verbally harassed him). In *Swanson*, another panel of this Court upheld summary judgment in favor of the college in a personal injury action claiming both respondeat superior and apparent authority. There, a senior baseball player at Wabash conducted off-season baseball practice sessions for current or potential players interested in practicing during the fall semester. When he approached the Wabash coach about it, the coach stated that he had no objections but that he could not participate in it himself due to scheduling constraints. He allowed the senior player to use some of the team's equipment, but informed him that he was otherwise "on his own."

504 N.E.2d at 332. The Dean of Men gave him some money for baseballs, but had no communication with any of the other participants. The senior player placed an announcement in the college circular and ran the practices at a nearby city-owned park. During an outfield practice, freshman potential player Swanson was hit in the eye with the ball and suffered injuries. He filed a personal injury action against Wabash, claiming that the college was vicariously liable. In affirming a summary judgment order in favor of Wabash, the Swanson court found that the college had no right to control the senior player's conduct and that the senior player was acting neither as an agent nor as an employee of the college when he conducted the off-season practices. *Id.*

### A. Wabash

Yost asserts that Wabash and Phi Psi had a principal/agent relationship based on their landlord/tenant relationship and on the college/student relationship between Wabash and Phi Psi's members. The trial court found that the landlord/tenant relationship between Wabash and Phi Psi did not extend to an agency relationship. In *Mooney-Mueller-Ward, Inc. v. Woods*, 175 Ind. App. 302, 306-07, 371 N.E.2d 400, 403-04 (1978), another panel of this Court found that where the tenant controlled every facet of the commercial operation on the leasehold premises and the landlord had no control over the day-to-day operation, the relationship did not amount to an agency relationship.

Here, Yost cites Wabash's retention of a right to enter the Phi Psi house as evidence of control and consent. He also cites Wabash's entry on the premises to inspect for cleanliness. The landlord's reservation of the right to enter the leasehold premises for inspection does not

necessarily constitute a reservation of a right to control the tenants' actions. *Olds v. Noel*, 857 N.E.2d 1041, 1044 (Ind. Ct. App. 2006). In this case, the dean could also enter the premises to discuss membership and disciplinary matters with officers. However, Wabash lacked control over both the day-to-day operations of Phi Psi and the bylaws by which the chapter operated, and Phi Psi did not consent to be controlled on a daily basis by Wabash.

Moreover, Yost's second basis for the alleged agency relationship between Wabash and Phi Psi members, i.e., college/student, does not amount to an agency relationship. As discussed, a college does not have a parental duty to supervise or control its adult students. *Campbell*, 495 N.E.2d at 232. The record is devoid of any designated evidence that Wabash was even aware of Phi Psi's local traditions of creeking and showering. As such, Wabash did not direct the activities between Yost and the active brothers within Phi Psi's walls at 2:00 a.m. on September 4, 2007. Thus, the trial court did not err in determining as a matter of law that Wabash was not vicariously liable.

### B. *Phi Psi National*

The trial court found that the Phi Psi National was not vicariously liable for the acts of the local Phi Psi chapter or its members. Yost argues that Phi Psi National's anti-hazing policies and power to discipline the local chapters and their members amount to an agency relationship under which Phi Psi National had the right to control the activities that led to his injuries and the local Phi Psi chapter acquiesced to that control. The designated evidence indicates that Phi Psi National is basically a resource and support services organization that provides educational programming to its chapters. Although the chapters have agreed to

34

adhere to the overall policies and principles espoused by Phi Psi National, their implementation and procedures are matters left to the local chapters. Phi Psi National's disciplinary power is more akin to an appellate tribunal than a constant controlling hand. Moreover, with respect to the specific activities that preceded Yost's encounter with Cravens, Phi Psi National was unaware that Phi Psi even had the local traditions of creeking and showering, let alone that they were listed as traditions in the local chapter's pledge packet. Based on the foregoing, we find no error in the trial court's decision to grant summary judgment in favor of Phi Psi National on the issue of vicarious liability.

### IV. *Punitive Damages*

Finally, Yost claims that the trial court erred in granting summary judgment in favor of the Appellees on his claim for punitive damages. "Punitive damages may be awarded only if there is clear and convincing evidence that [the] defendant acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing." *Williams v. Younginer*, 851 N.E.2d 351, 358 (Ind. Ct. App. 2006) (citation and internal quotation marks omitted), *trans. denied*. Yost correctly notes that a punitive damages analysis usually involves questions of fact. *Cheatham v. Pohle*, 789 N.E.2d 467, 472 (Ind. 2003). However, a punitive damages claim can be sustained only if it is accompanied by a viable claim for compensatory damages. *Id*. at 473-74. As previously discussed, there is no viable underlying claim for compensatory damages in this case. Thus, there is no viable claim for punitive

35

damages, and the trial court did not err in granting summary judgment in favor of Appellees on this claim.

## *Conclusion*

In sum, we find as a matter of law that Yost was not a victim of hazing under Indiana's anti-hazing statute or of other foreseeable criminal conduct. However, such a finding is not dispositive of the issue of duty. For example, there may be circumstances in which the challenged conduct is not necessarily criminal and not necessarily hazing, but where a college and/or fraternity have created an inherently dangerous environment such that other obligations are created and liability arises. This is not one of those circumstances. We agree that a college cannot simply turn a blind eye to inherently dangerous activities on its campus; neither can a fraternity ignore such activities within its walls. Nevertheless, we reiterate that such institutions/organizations are not guarantors or insurers of their adult student-members' safety, and we reject the notion that all fraternities should be impugned based on the activities of a few. Moreover, we recognize the untenable situation that can be created when colleges and fraternities attempt to deal with potentially dangerous activities by promulgating rules, only to have the enactment and enforcement of those rules thrown back at them as an assumption of duty.

We find as a matter of law that Appellees did not breach any duty owed to Yost. While we reject Wabash's argument that its sole duty to its students is to protect them from foreseeable criminal activity, we also reject any attempt to create a special limited duty just short of in loco parentis. We conclude that the analysis adopted in the alcohol consumption

36

cases, i.e., whether the activity was college- or fraternity-sponsored or -controlled, is a reasonable approach in other civil hazing actions when assessing whether the college or fraternity breached a duty to act reasonably under the circumstances.

Finally, we are mindful of the injuries suffered by Yost and other college students in their pursuit of fellowship via brotherhood, yet we find that "the ideals of fellowship espoused by [a fraternity] are insufficient, standing alone, to create a duty … to protect [a participant] from his voluntary, adult choice." *Garofalo*, 616 N.W.2d at 654. Based on the foregoing, we affirm the trial court's judgment in all respects.

Affirmed.

BRADFORD, J., concurs.

VAIDIK, J., concurs in part and dissents in part with separate opinion.

_____

# IN THE
# COURT OF APPEALS OF INDIANA

_____

BRIAN YOST,                                    )
                                               )
    Appellant-Plaintiff,               )
                                               )
      vs.                             )    No. 54A01-1201-CT-31
                                               )
WABASH COLLEGE, PHI KAPPA PSI                  )
FRATERNITY, INC., PHI KAPPA PSI                )
FRATERNITY – INDIANA GAMMA                     )
CHAPTER AT WABASH COLLEGE, and                 )
NATHAN CRAVENS,                                )
                                               )
    Appellees-Defendants.              )
                                               )

_____

**VAIDIK, Judge, concurring in part, dissenting in part.**

Based on the designated evidence, I agree with the majority's decision to affirm summary judgment in favor of Phi Psi National, but I respectfully dissent from the majority's decision that Yost failed to establish a genuine issue of material fact regarding whether Wabash and Phi Psi owed him a duty of care under the circumstances. I find that there is an issue of fact concerning whether the events of that night constituted criminal hazing and whether they were reasonably foreseeable to Wabash. I also find that there is an issue of fact over whether Phi Psi assumed a duty of care toward Yost. I therefore believe that the trial court erred by granting summary judgment in favor of both Wabash and Phi Psi.

As my colleagues note, Yost argues that Wabash owed him a duty of care under the theory of premises liability since Wabash was the owner and landlord of the Phi Psi fraternity house and "[l]andowners have a duty to take reasonable precautions to protect their invitees from foreseeable criminal attacks, i.e., hazing." Slip op. p. 9 (citing *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1052 (Ind. 2003)). However, the majority holds that as a matter of law Yost's showering was not hazing and therefore not criminal. *Id.* at 16. Unlike my colleagues, I find that there is a question of fact as to whether the actions involved in this case were hazing.

Yost stated that he wanted to demonstrate his "ferocity" to the other Phi Psis, so he resisted by "kicking and screaming." Appellant's App. p. 222, 513. Despite his resistance, the Phi Psis involved still tried to shower him, stopping only when Cravens rendered him unconscious. This act did not take place within a vacuum. Rather, it took place in an atmosphere where "creeking" and "showering" were explicitly outlined in the Phi Psi pledge handbook. *Id.* at 517. It also took place while Yost, an incoming freshman and soon-to-be formal pledge, was living in the Phi Psi fraternity house. The house was owned by the school and provided student housing for the incoming freshman. Yost, Wabash, and Phi Psi all knew Yost's living circumstances; if Yost did not follow through with pledging Phi Psi, he would have had to discuss his reasons for leaving with the Associate Dean of the school and find a new living arrangement just months into his freshman year. *Id.* at 472. These designated facts create a genuine issue of material fact as to whether Yost's showering was a condition of his membership in Phi Psi and a condition for continuing residency at the house.[16] As such, this is a jury decision and not ours.

In addition to presenting a question about its status as hazing, I also find that the designated

---

[16] At least one fraternity brother seemed to think so. Jessie McCarley testified that if a member resisted a showering and the brothers continued to shower him, that would constitute hazing. Appellant's App. p. 537.

evidence supports the conclusion that any hazing of Yost or other fraternity pledges was reasonably foreseeable by Wabash. Since the early 2000s, there have been fifteen reported instances of hazing that Wabash was aware of and took action on, two of which resulted in the death of students, and three others which directly involved the Phi Psi house.[17] *Id.* at 458-64. This is sufficient evidence to create the reasonable inference that the hazing was foreseeable in Wabash's fraternity houses.

Additionally, while Wabash did sanction the fraternities involved in some of these hazing instances, other times the college leadership did not take specific disciplinary action, they just "worked very closely with rising house leadership each year to try to prevent similar occurrences." *Id.* Instead of taking a hard line against hazing, a reasonable inference from the designated evidence is that Wabash even encouraged such behavior by doing such things as failing to recognize hazing as hazing, promoting drinking during class and drinking with campus security, and failing to enforce the Gentleman's Rule.[18] *Id.* at 228-30, 244-46, 264. This also suggests that Wabash has a pattern of turning a blind eye to hazing on its campus, thereby breaching its duty as a landowner to Yost.[19] The facts presented therefore create genuine issues of fact both as to whether Yost's injury was the result of hazing and whether Wabash breached the duty it owed to Yost, again making this a jury question.

I also respectfully disagree with the majority's decision that summary judgment in favor of Phi Psi was appropriate; I find that there is a genuine issue of fact as to whether Phi Psi assumed a duty of care toward Yost. The Phi Psi manual explicitly states that "Phi Kappa Psi became the first

---

[17] We recognize that the two student deaths occurred after the incident involved in this case. However, those deaths further support a showing of a culture of hazing that is present on Wabash's campus.

[18] The Gentleman's Rule is Wabash's rule for student behavior and states: "The student is expected to conduct himself at all times, both on and off the campus, as a gentleman and a responsible citizen." Appellant's App. p. 466-68.

[19] Turning a blind eye to this behavior is no different than "a wink and a nod" that unofficially sanctions those actions. *See A Few Good Men* (Columbia Pictures 1992).

national social fraternity to create a department *to oversee* and improve this portion of fraternity life," in reference to the pledging process and the problems it historically had. *Id.* at 648 (emphasis added). The manual goes on to say, "At the very least, the chapter is responsible for safeguarding the health, safety and well-being of its pledges." *Id.* at 651. Further, "creekings" and "showerings" are outlined in the pledge manual as "Indiana Gamma Traditions," indicating that they are events sanctioned by the chapter. *Id.* at 517.

Because Phi Psi has sanctioned these events and has explicitly stated that it oversees pledging, there is evidence supporting the inference that Phi Psi has assumed a duty toward Yost in this instance. The majority says this is not the case because Yost's showering was not conducted in the manner that is outlined in the pledge manual, specifically this was not a "planned, celebratory event[] involving all or most of the fraternity brothers." Slip op. p. 15. This statement punctuates the difference between the majority's view and mine. In my opinion, the majority's view of pledging and consequently hazing is far too restrictive. Hazing need only be conduct which requires a person to perform an act as a condition of association with the group. To be sure, evidence of the number of active brothers involved in the conduct and the similarity of the conduct with the formal requirements set forth in the pledge book is evidence to be considered in deciding whether a hazing occurred; but, these are only two of the many factors that must be considered. In my view, the fact that showering was conduct outlined in the pledge manual, Phi Psi oversees the pledging process, and there is a material question as to whether hazing occurred creates a genuine issue of material fact as to whether Phi Psi assumed a duty to Yost. Therefore, I would reverse the trial court's decision to grant summary judgment in favor of Phi Psi.

All said, I believe that the designated facts could reasonably lead a trier of fact to conclude that hazing occurred here—hazing that both Phi Psi and Wabash had a duty to stop yet ignored.

41

Because of this, I believe that this is a jury's call and not ours.